## WILLIAM B. MERSHON & CO. v. BAY CITY BOX & LUMBER CO.

(Circuit Court, E. D. Michigan, N. D. July 19, 1910. Supplemental Opinion, December 28, 1910.)

### No. 64.

1. PATENTS (§ 328*)—INFRINGEMENT—RESAWING MACHINE.

The Gilbert patent, No 537,526, for a resawing machine, construed with the limitations required to avoid anticipation by the prior art, *held* not infringed.

2. PATENTS (§ 56*)—ANTICIPATION.

Old mechanism, fully capable of a use not then observed, anticipates a later patent for the application of that means to that use. Patentability cannot rest on the observation in a given device of a usefulness not before noticed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 56.*]

3. PATENTS (§ 27*)—INVENTION—TRANSFER OF MECHANISM FROM ANALOGOUS ART.

Resawing machines and hub mortising machines are so nearly alike in their mechanism for moving and handling the wood operated on that a mere transfer of such mechanism from one machine to the other does not involve invention.

[Ed. Note.—For other cases, see Patents, Cent Dig. §§ 31, 32; Dec. Dig. § 27.*]

4. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—RESAWING MACHINE.

The Mershon patent, No. 538,688, for a resawing machine, one of the chief features of which is mechanism by which it performs the so-called function of "discrimination" by automatically changing the board operated on from a slabbing position to a self-centering position when it is of a predetermined thickness, was anticipated as to claim 1, but as to claims 3, 4, 5, and 15 was not anticipated, nor is it void for prior public use, but is valid. Also *held* infringed.

5. PATENTS (§ 76*)—SALE BEFORE APPLICATION—"ON SALE TWO YEARS."

A machine put out for trial, under a "sale or return" contract, does not constitute a being on sale two years before the patent application, unless the trial period expired, or unless there was actual acceptance more than two years before the application.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92–98; Dec. Dig. § 76.*]

---

**6. PATENTS (§ 165*)—FUNCTIONAL CLAIM.**
    A claim to "means" is not necessarily functional.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 165.*]

**7. PATENTS (§ 328*)—INFRINGEMENT—RESAWING MACHINE.**
    The Mershon patent, No. 547,796, for mechanism for the manual adjust-ment of the roll carrying slides of a resawing machine, must be limited to substantially the mechanism described, and, as so limited, *held* not infringed.

**8. PATENTS (§ 313*)—SUIT FOR INFRINGEMENT—ISSUES—RIGHT OF COMPLAINANT TO DISMISS.**
    A complainant in a suit for infringement of a patent, where infringement of a number of claims is alleged, and issue is taken on their validity, cannot dismiss as to one claim only as matter of right after proofs have been taken, but the defendant has the right to an adjudication upon the validity of such claim.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 313.*]

**9. PATENTS (§ 316*)—SUIT FOR INFRINGEMENT—EFFECT OF DECISION OF PARTIAL INVALIDITY.**
    Where the Circuit Court in a suit for infringement of a patent has held certain of its claims invalid, but found others valid and infringed, and an appeal is probable, it should, by its decree, dismiss the bill as to the invalid claims, and grant the usual relief as to the others by interlocutory or final decree as the case may require, leaving for subsequent proceedings the question of the necessary disclaimer of the invalid claims.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 316.*]

**10. PATENTS (§ 323*)—SUIT FOR INFRINGEMENT—DECREE.**
    Where, in a suit for infringement of a patent, the court adjudges certain of the claims invalid, and others valid and infringed, it is proper that its decree should recite the finding of invalidity.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 323.*]

In Equity. Suit by William B. Mershon & Co. against the Bay City Box & Lumber Company. Decree in part for complainant, and in part for defendant.

Edward Rector, for complainant.
Charles C. Linthicum and James L. Whittemore, for defendant.

DENISON, District Judge (sitting by designation). A resawing machine is for subdividing the board or timber produced by the original sawing. It may be located in the sawmill for producing thinner market forms of lumber than it is desired to cut from the log, or in the secondary plant for producing thin box lumber, heavy veneer or the like. It consists, essentially, in a slitting saw, circular or band, cutting on a vertical line, and opposing feed and pressure rolls, usually in sets, for gripping the board and feeding it as it travels on its edge along a table to the saw. Each of these opposing feed rolls is carried upon a slide, moving laterally of the table, and adjustable, so that the two opposite sets of rolls may approach toward, and recede from, each other, and each slide is connected to a weight or spring pushing it toward the center, thus giving to the rolls an elastic pressure on the board.

Earlier than any of the patents in suit, it was common to give to these machines capacity for three functions: First, slitting a board through

the center to make two equal parts. As the boards vary in thickness, or may vary, as they come to the saw, the machine must automatically present to the saw the center line of the board. This was accomplished by connecting the slides to each other by some equalizing device so that they and their respective rolls must move to or from the line of cut simultaneously and equally. This operation was called "self-centering." Second, taking from one side of the board a cut of a predetermined, standard thickness. This was done by disconnecting the equalizer, adjusting the right-hand slide and roll by a gauge at the fixed distance from the line of cut, and allowing the weight-pressed, left-hand rolls alone to exert the feeding pressure. With the machine thus set, the board could be run through several times, leaving, in the last cut, the deficiency, if any, under the maximum thickness. This operation was called "slabbing." Third, dividing the board on a line diagonal to its sides so that the right-hand board, for example, would be thick at the top and thin at the bottom and the left-hand board would be thick at the bottom and thin at the top, thus producing a standard weather-boarding or siding. This was accomplished by tilting both sets of rolls slightly away from the vertical position, so that the sides of the board, as presented to the slitting saw, were not parallel with the saw.

[1] The first patent in suit, being No. 537,526, issued April 16, 1895, upon the application of H. J. Gilbert, filed October 22, 1894, involves the combination of the first and third of these functions. Claims 1, 2, 5, 6, and 13 are relied upon. The mechanism is most generally described in claims like claim 2, and most specifically identified in claim 13. Those two claims are as follows:

"2. In a resawing machine, the combination with the saw, mounted in a substantially fixed position, of the set of feed rolls adjustable toward and from the same in the cutting plane thereof, and means for moving the rolls toward and from the saw and inclining them to the plane thereof, substantially as described."

"13. In a resawing machine, the combination of a base casting or frame-work having a concave seat, a feed roll supporting frame composed of a substantially cylindrical portion resting in said seat, and adapted to slide back and forth and tilt therein, and a transverse horizontal portion carried by the cylindrical portion, a pair of slides transversely adjustable upon said horizontal portion of the frame, a set of feed rolls carried by the slides, and means for adjusting said slides upon the frame and for moving the latter back and forth in its seat and tilting it, substantially as described."

Obviously, "fore and aft" adjustment of the feed rolls to and from the saw was desirable to accommodate the different problems presented by special forms of stock; and whenever the stock was very thin, or was warped, the rolls should be as close as possible to the saw, while, with thicker stuff, or for convenience of access either to saw or rolls, it might be desirable to increase the distance between them. It was, accordingly, entirely common to provide adjusting means by which the roll-carrying slides could be adjusted to and from the saw, or by which the saw could be similarly adjusted to or from the rolls. It was also common to provide means for tilting the rolls; and before tilting the rolls, it would be advisable to withdraw them from the saw, if they were too close for the tilting operation. Gilbert devised simple and

efficient means for this withdrawing and this tilting. By his construction, the frame supporting the roll carrying slides, was carried on a cylindrical body projecting beyond the opposite sides of the frame, forward and back, and resting in concave seats in the bed frame. These concave seats were longer than the cylinder ends resting therein, and thus the latter had a longitudinal play, permitting the whole frame to have a sliding movement to and from the saw. It is also obvious that a tilting or rocking capacity was thus given to the sliding frame. The concave seat was provided with a slot, which, in its forward part, was located at the bottom of the seat and was parallel with the line of cut, and, at its rear portion, was curved to one side. The cylinder end was provided with a bolt depending vertically into this curved slot; hence, as the frame was withdrawn from the saw, this bolt and slot connection compelled the tilting of the rolls, and, as it was returned toward the saw, compelled the rolls to take their vertical position. While in the forward position, the device could not be used for making siding, and while in the withdrawn position, it could not be used for ordinary resawing. This construction seems to have been novel and useful, and is the express basis of several claims in the patent, but complainant's counsel say is not called for by the claims in suit.

The defendant's structure is provided with somewhat similar, passive means for permitting the frame to slide and rock, the cylinder with its ends sliding in a concave seat having become pins or trunnions rocking and sliding in their boxes. The sliding and tilting, however, are accomplished by an adjustment of set screws at the sides of the frame and by a worm and segment. When it is desired to withdraw and tilt the mechanism, it is first completely withdrawn by a manipulation of set screws, and it is then tilted, as much or as little as is desired, by a wholly independent adjustment. There is no bolt and slot connection whatever.

It will be noticed that the claims in suit do not call, separately, for "means for moving" the rolls toward or from the saw, and for "means for inclining" the rolls, but call, in a unitary or combination way, for "means for sliding and inclining" the rolls. It might well be said that this language was fairly limited to the unitary or combination idea shown by the patent for concurrently accomplishing these two things, either result automatically accompanying the other; but on this construction of the claims, there would be no infringement.

If the claims in suit are capable of a construction broad enough to cover a device where the means for sliding and the means for tilting are substantially independent and where the two operations are successive and not coacting, but each is complete in itself, and if this can be considered a true combination, then they are anticipated by the Cooper machine. The use of this machine at a much earlier date than Gilbert's application is conclusively shown. It is not disputed that the frame and rolls of this machine could be moved to and from the saw, and could be tilted, the tilting by means substantially the same as in the case of defendant's structure, and the withdrawal by sliding contact between another part of the frame and the base. The argument to avoid anticipation is that the stated necessity for withdrawal before

tilting does not exist unless the rolls are so close to the saw as partly to embrace it and thus to strike it or come within dangerous proximity when they are tilted across its edge; that this situation arises only with the band saw, and not with the circular, and that the saw in the Cooper machine was circular; and that in the Cooper machine the saw slot in the table was at least one inch removed from the plane of the nearest face of the rolls when adjusted in their closest position, and hence, the rolls, if there tilted, would not have interfered with the saw. It is also said that while, in the Cooper machine, the slide and roll carrying frame was capable of tilting, the machine was so set up that this adjustment never did take place. It is then argued that, since this withdrawal for the purpose of tilting was not necessary with the Cooper construction and never did take place, Cooper did not have the essential idea of the Gilbert invention.

[2] I cannot accept this conclusion. Gilbert's essential idea, in the broad scope now claimed for it, was to provide a mechanism by which the rolls could be advanced close to the saw, and then, if it was desirable to tilt them, they could be withdrawn from the saw before the tilting. Cooper provided substantially the same mechanism, with these capacities, which the defendant uses. That he did not in fact use his mechanism for the particular purpose of Gilbert, or even that he did not foresee that such purpose would be a useful one, is not material. The claims in suit (except 13) as complainant now construes them, read on the Cooper machine, and, if granted to Cooper, Gilbert would infringe.

From a slightly different point of view, it may be said that if the slot in the table, through which the saw passed in the Gilbert machine, had been one inch longer then it was, so that the slide carrying frame, which, from its extreme withdrawn position, was capable of adjustment (for example) two inches towards the saw, had been capable of adjustment three inches toward the saw, Cooper would have been a perfect anticipation in every detail. Patentability cannot rest on such a distinction, where it does not pertain to function, but only to usefulness.

The Gas Burner Case (Clough v. Gilbert & B. Mfg. Co.) 106 U. S. 166, 1 Sup. Ct. 188, 27 L. Ed. 134, and the Carriage Spring Case (Topliff v. Topliff) 145 U. S. 156, 7 Sup. Ct. 1057, 30 L. Ed. 1110, are cited to the effect that the earlier device is not an anticipation if the idea was not present and if any modification, or even readjustment of parts, is necessary to bring out the new idea. This principle is not applicable here, for the idea was present in the Cooper machine, viz., the idea of providing means for tilting and means for fore and aft motion. When the mechanism was transferred from a circular to a band saw, it was seen that the fore and aft motion had additional utility, but the observation of the new usefulness was not invention.

[3] It is also said that claim 13 is distinguishable from Cooper, and, as distinguished, is infringed. If the feature which is thought to make this claim patentable over Cooper, is Gilbert's form of cylinder and concave seat, then there is no infringement; but if reliance is had upon the broad idea of mounting the stock-holding mechanism upon a

trunnion carried frame, so that the frame could both slide and rock, this idea is disclosed by the earlier hub mortisers. Shaping wood with a saw or shaping it with a chisel, cutting a slit for the whole length or a slot for a part of the length, are operations very possibly carried on side by side in a wood-working factory, and are not so remote from each other that it is invention to make a mere transfer.

[4] The second patent in suit is that issued to E. C. Mershon May 7, 1895, upon application filed May 8, 1894, the serial number of the patent being 538,688. The claims relied upon are 3, 4, 5, and 15. Claim 15 is the most specific, and claim 3, perhaps, the broadest of these selected claims. They are as follows:

"3. In a resawing machine, the combination with slides and feeding rollers mounted thereon, of self-centering or equalizing mechanism therefor tending to advance said rollers toward the line of cut, a stop by which the rollers or set of rollers at one side of said line may be halted at a pre-determined distance from the line of cut, and means of continuing the advance of the opposing roller or set of rollers."

"15. In a re-sawing machine, the combination with the slides, of a set of feeding rolls fixed upon one slide, an opposing set of feeding rolls mounted upon the other slide and spring-pressed toward said first mentioned rolls, means for adjusting said slides and their feeding rolls relatively to each other and to the line of cut, self-centering mechanism for said rolls, and means for limiting the action of the self-centering mechanism at a pre-determined point without preventing the advance of the spring-pressed rolls."

These claims express, in apt words, the mechanical construction devised by Mershon suitable for the exercise of the first and second functions described above, i. e., self-centering and slabbing, and for automatic shifting from one function to the other. It may be assumed that it is desired to produce, by this machine, boards one-half inch in thickness. In such case, a slight surplus thickness will do no harm, but any deficiency in the minimum thickness may make the board worthless for the desired purpose. It may further be assumed that the boards, coming to the device while it is set for self-centering, are of the standard thickness of one inch, but that, occasionally, a board either overruns or underruns. If it overruns, it will, by the self-centering operation, make two boards, each slightly overrunning, but in the other case, it will make two boards, each below the required minimum, and so will spoil both. If adjusted to the "slabbing" position, the machine will take off one board of the required thickness, and only the remainder will be rejected. Where the general character of the material fed to the machine changes, the operator can stop the machine, and, by hand, adjust it from the self-centering position to the slabbing position, and vice versa, and means for this shifting were common in earlier machines. Such stoppage and manual adjustment take time and are quite impracticable with reference to a continuous feed of boards of varying thickness. This Mershon machine was the first one shown by the record which had the capacity, automatically, to shift itself from the self-centering position to the slabbing position and vice versa, to meet the varying thicknesses of successive boards. This capacity has been called, by counsel, "discrimination."

In the normal working of the self-centering operation, as the board

entered between the two sets of rolls and as the spring or weight pressed both slides toward the center, the board instantly began to force them apart and instantly to put into operation the equalizer connecting the slides, whereby both slides and both sets of rolls were forced to withdraw equally from the predetermined center. Mershon provided that the rolls upon the right side should be set by a gauge, as for slabbing, but that the rolls on the left side should yield a short distance against an independent spring or equivalent pressure, so that only when they were retracted a short distance from the center and encountered a stop connected with their slide did the thickness of the board begin to have any effect upon the slides, and, therefore, upon the equalizer; and, hence, until this point was reached, the self-centering function was not called into play. The other, or comparatively fixed, set of rolls would remain at the determined distance from the line of cut, while the independently spring-pressed rolls, within the limitation provided by their stop connection with their slide, would be only pressure rolls, holding the board against the fixed rolls and causing slabbing instead of self-centering to take place; while just as soon as they received a board of the necessary double thickness, the independently spring-pressed rolls would be thrown back against their stops, the slides and the equalizer would be affected, and self-centering would result.

The essential invention here was, therefore, the superimposing upon the existing and common self-centering mechanism of a supplementary and independent yielding or spring action between one set of rolls and their carrying slide, whereby they could retreat upon the slide a short distance before making rigid and operative connection with it. Mershon accomplished this result by placing, back of these rolls, a spring of such power, as compared with the force required to operate the equalizing means, that the spring would yield, without affecting the slide or equalizer, until its free end made contact with a stop connected to its slide, and thereby rigid connection in that direction was set up and further yielding must be by the slide. The fifteenth claim and also the fifth claim specify this spring pressure. The other claims in suit do not; but I think the patent, within the limitations of the invention as above stated, is entitled to a fairly broad range of equivalents, and that all the claims in suit cover this independent yielding adjustment, whether produced by spring pressure or by equivalent weight pressure.

The defendant's device accomplishes this same result of discrimination and in substantially the same way. The main structural differences are two:

First. In defendant's device, the two slides are not directly connected by an equalizer, but each slide superficially appears to be independent of the other. The equalizing connection, however, exists, although less immediate. Each slide is connected by rack and pinion to a shaft, each shaft has a hand wheel with a peripheral gear, and these gears are connected by a worm so that when one wheel is rotated in one direction, the other wheel is, automatically, to the same extent, rotated in the opposite direction. This is, for the purpose of this inquiry, a full equivalent of Mershon's more simple and direct equalizer.

Second. The defendant's left-hand roll has no supplementary spring

directly interposed between it and a stop upon its carrying slide. It is, however, connected to an independent weight hung upon an appropriate lever, which weight presses this roll forward against the thin board to be slabbed, and the roll is then a pressure roll only; and as the thickness of the board increases, this roller retracts from the line of cut, overcoming and raising only this independent, supplementary weight. The weight lever thus connected to the left-hand, independently yielding roll, thereupon, as it rises, comes in contact with a stop upon the main weighted lever which draws the slides together, and so the left-hand roll cannot retreat further without lifting the main weight, accomplishing a stop connection with its slides and so throwing into action the self-centering mechanism. In the Mershon construction, the yielding roll yields against independent spring pressure until it makes contact with a stop upon the roll standard immediately carried by the slide. In the defendant's construction, the independently weight-pressed roll yields until its weight lever makes contact with a stop immediately carried by the slide. The yielding action is substantially the same; the stop contact is substantially the same; and the result, calling into action the self-centering mechanism, is the same. I think one is the equivalent of the other.

[5] The main defenses against this Mershon patent, aside from noninfringement, are two: It is said that, more than two years prior to his application date, Mershon sold, for use, a machine constructed in accordance with his patent, this being the machine sold to the Bohn Company, of Minneapolis. I am not satisfied that this was a complete sale, so as to amount to the statutory bar, two years before the application, viz., before May 8, 1892. The machine in question was shipped by Mershon, to the Bohn Company, in March, 1892. It was not an absolute sale, nor, technically, a conditional sale, but it was a sale on trial, a "sale or return." It was, by express agreement, shipped "to let you test it." It did not become a complete sale, so as to pass title, until accepted, expressly or impliedly, by the purchaser. As late as April 12, the purchaser wrote that it had not been tried sufficiently. The next thing shown by the record is that it was paid for on June 11th. This falls short of the necessary proof to show before May 8th a complete sale, as distinguished from a shipment on trial, essentially experimental.

Further, I do not think the Bohn machine was, in the respect now under consideration, the same as the patented machine. Mershon testifies that this faculty of discrimination was not discovered by him, nor did he build any machine intended to have that capacity, until nearly two years later. In order to have this function, it was necessary that the independent springs should yield readily until they met their stop, and it would be fatal to make the springs so stiff and unyielding that their resistance would bring the self-centering mechanism into play before the stop was encountered. The springs, put in evidence as duplicates of the springs in the Bohn machine, appear to have this stiff and unyielding character. The evidence as to the machine in Detroit, also of early construction and with similar springs, seems to show that it did not, in fact, have this capacity. Certainly, the record

falls far short of showing with the necessary conclusiveness that the Bohn machine did have the function in question; it rather indicates the contrary.

The other chief defense against this patent is found in the proposition that it was anticipated by the Connell & Dengler patent, No. 243,692, of July 5, 1881, and by machines made thereunder. The Connell & Dengler machine unquestionably had the self-centering capacity, and undoubtedly could be, and was, manually set or adjusted so that it did not self-center but would slab. Its left-hand rolls, however, were not capable of a yielding retreat from the board followed by automatic, rigid engagement with their slides, thus producing, upon further pressure, the equalized motion of both slides. The rolls lack this feature or its equivalent. It is sought to find this equivalent in a spring-pressed jaw or clamp, not connected with the rolls, and located close up to the face of the saw. It is true that with a thin board, this spring jaw would hold it over against the right-hand rolls, in position for slabbing, and the board would be wholly out of contact with the left-hand rolls, and that then, whenever this board or a following board became thick enough to make contact with the left-hand rolls, the self-centering operation would take place; but this spring jaw was wholly independent of the left-hand rolls and slides, did not make contact with any stop upon the slide, and did not automatically put the slide into motion. It only held the board in a slabbing position, with possible or very doubtful efficiency, when the board was wholly out of contact with the left-hand rolls. It was not intended for this discriminating function, but rather for the purpose of gripping the end of the board after it left the rolls so that it might not split but might be sawed to the very end; and it did not, in fact, have this function in any appreciable degree. This is evident not only from the construction, but from the testimony as to the actual operation and history of the machine. So far as known, it never, in its commercial operation, had performed this discrimination. It was only when specially operated by defendant's expert in the preparation of testimony in this case and upon special and peculiar stock, that it was made to display the discriminating function in a slight and unsatisfactory degree, a degree not sufficient for practical and ordinary uses.

[6] In further defense to this patent, it is urged that the decision of the Court of Appeals in Tyden v. Ohio Table Co. et al., 152 Fed. 183, 81 C. C. A. 425, holds that a claim generally to "means" is functional and invalid. I do not so understand Judge Lurton's opinion. In that case, the means shown were so ordinary and common, and the device so lacking in invention, except (possibly) in the result or function disclosed, as to compel the conclusion that the patentee intended to claim the result, by whatever means accomplished. Other defenses seem less pertinent than these which have been considered.

[7] The third patent involved is that applied for July 1, 1895, by Mershon, and issued to him October 15, 1895, as No. 547,796. This invention has to do with the manual adjustment of the roll-carrying slides to and from each other. Such adjustment had been by means of screws and was necessarily somewhat slow. If the rolls were set

for one-inch lumber and a much thicker piece, as, for example, a three-inch piece, came along, the rolls would not automatically open far enough to receive this piece, and they must be readjusted. It was desirable, also, that they should be adjustable so quickly that the operator need not stop appreciably, if at all, the progress of lumber through the machine. Mershon therefore provided a lever so con-nected with a quadrant that, by moving the lever to the desired point on the quadrant, the rolls would be set at the indicated width, and being so set, could exercise their self-centering or slabbing functions within the limits appropriate to that setting. He provided, also, a spring detent by which the shifting lever would be locked at the selected point on the quadrant. He accomplished this result by using a long and a short lever pivoted together at the end of the short lever. The short arm of the long lever was pivoted to slide No. 1 and fulcrumed on the pivot connecting the two levers, while the short lever was fulcrumed on slide No. 2. The two levers thus became an equalizer between the two slides, to be operated by moving the handle ends of the levers to and from each other. He then interposed between the two levers, and also pivoted on their common point, a plate or bar having its outer end attached to the frame of the machine and carrying notches with which the spring detents on the lever arms engaged. This interposed plate, he called an idle lever.

The claims in suit are 1, 2, 3, 4, 6, 9, and 12. These claims vary in expression, but so far as the questions herein involved are con-cerned, claim 1, reading as follows, is typical:

"1. The combination with the feeding rolls automatically movable to-ward the line of cut, of means for adjusting each roll or set of rolls independently of the other, and mechanism for instantaneously and accu-rately adjusting said rolls at any time, and independently of the automatic action thereof."

If this claim is confined to the form of devices shown in the Mershon patent, or to anything visually resembling those forms, there is no infringement; it is only by giving to the words "mechanism" and "means" the broadest construction and by allowing to the patentee an extremely liberal range of equivalents that infringement can be found.

The defendant uses no pivoted levers, constituting an equalizer, and has no idle lever or interposed plate. In its device, the hand wheel at the outer end of the pinion-carrying shaft connected with the rack upon each slide, carries, upon the edge of its rim, a graduated scale, which, in connection with a pointer, shows the exact distance which that slide is set away from the line of cut. The two wheels may be connected together so as to operate simultaneously in reverse direction or may be manually disconnected.

In the Mershon device, when the operator wishes to set for a given thickness, he takes both levers, one in each hand, disengages the spring detents from the idle lever, and thereby disconnects both levers from the frame and destroys the automatic, self-centering function. He then adjusts both levers at the proper respective notches on the quadrant, and allows them to be there locked by the spring detents, and thus again establishes connection with the frame and makes the self-center-

ing function operative. If the phrases "instantaneously and accurately adjusting" and "instantaneously shifting" are capable of any intelligible definition, they refer to this very quick motion by which one practically continuous movement of the operator's arm and fingers disconnects, adjusts, and reconnects, the adjustment and reconnection being, in part, automatic, by the action of the spring detent which will make the locking connection at exactly the right point, if the parts are brought approximately to that point, or will automatically lock as the lever passes over that point.

In defendant's device, the operator must first, by movement of his foot, disconnect the two hand wheels. He must then adjust one of them to the desired point on the scale and without the aid of any spring detent. He must then adjust the other in the same way to the corresponding, desired point, and must then re-engage the wheels by another motion of the foot. This re-engagement may or may not be possible at exactly the selected point, and if not, there must be a further, careful, manual adjustment. Further, while the idle lever is expressly made an element only of claims 4 and 9, I think it must be considered as practically an element of every claim sued upon, being indicated by the word "means" or by the word "mechanism"; and it is not found in defendant's device. True, this device has parts which bring about, in a general way, the same result accomplished by the Mershon idle lever, but they certainly do not resemble it in form, and I think they do not embody it in substance.

If Mershon had been the first to solve the problems of an approximate but quick "to and from" adjustment in a pair of grip devices, followed, if necessary, by an independent, accurate adjustment, he might have been entitled to the broad construction claimed; but this general result was well known. The record shows several instances of its application, and it is sufficient to refer to the several gang edgers. An edger and a resawing machine are of the same general type and class. Each is for the purpose of slitting a board lengthwise into two pieces, and the gang edger simply makes, at one cutting, more than two pieces. Adjusting the saws of a gang edger to and from each other on their common shaft, and adjusting the rolls of a re-sawing machine to and from each other on their common table, present practically the same problem in the same art. An inspection of the Holmes machine shows the same general association of the two pivoted levers, each with a notched quadrant and a spring detent, for rapidly adjusting the width of the opening between the edging saws. The Rowley & Hermance machine shows a very close approximation to the two levers provided with spring detents and having an interposed, notched quadrant approximately of the same shape as the Mershon idle lever. The Smith edger and the Williamsport gang ripping machine show the same construction. There was nothing generically new in Mershon's idea, and he is not entitled to a construction which will include the defendant's device.

It follows that the bill will be dismissed, as to the Gilbert patent and the second Mershon patent, and that the usual decree for injunction and accounting will be made as to claims 3, 4, 5, and 15

of the first Mershon patent. Inasmuch as the first claim of the first Mershon patent was insisted upon during the taking of a large part of the proofs and was then withdrawn, and is, upon this record, anticipated, it follows that neither party should recover costs so far as the record pertains to this patent. It is approximately true that one-half of the record pertains to this second Mershon patent and one-half the record to the other two patents, as to which the finding is for the defendant. The defendant will, therefore, upon the entire record, recover one-half of its total, taxable costs.

### Supplemental Opinion.

The opinion found that claim 1 of the Mershon patent was anticipated, and accordingly indicated that no costs would be awarded, as to this patent, although, as to other claims, complainant prevailed. Upon settlement of decree, complainant asks reconsideration of this conclusion, because mistaken on the merits and because the claim was withdrawn before hearing; while defendant asks that, because of the presence of this invalid claim, the bill be dismissed absolutely.

On complainant's prima facie case, its expert included this claim among those pronounced to be infringed. Defendant's expert stated and explained the facts said to make the claim invalid. While briefs were in preparation for the hearing, complainant's counsel notified defendant's counsel that no decree would be asked upon this claim.

[8] In a suit at law, plaintiff may usually discontinue at any moment before submission. Complainant, in an equity suit, has, as a general rule, a similar right. Just how far this right is modified in patent cases by the nature of the controversy, the public interests, etc., is not clear. Some courts have denied the right in the later stages of the case. Whatever the true rule may be in this respect, it does not necessarily apply to the withdrawal of part of the claims sued upon. Where several patents are joined in one case, they are still, in a sense, several suits, and the rule of discontinuance may well apply separately; but the several claims sued upon of one patent are parts of a unit. Upon the filing of the bill specifying what claims are sued upon, or supplemented by later specification, and by the answer, the issue is made up. The complainant may perhaps dismiss the suit as to one several cause of action, but he cannot continue to prosecute that cause of action and at the same time change the issue thereunder, without the consent of the other party or leave of court. I think defendant, in such a case as this, has a right to the opinion and decree of the court upon the issue as it was first declared or interpreted by complainant and accepted by defendant. The validity of claim 1 therefore, remained for decision. I adhere to the conclusion that the claim is invalid, because, in the broad sense in which it was intended, it is anticipated by several of the old machines and patents in the record, and because of public use or sale by Mershon; but in view of the highly technical character of claims and the difficulty of determining what they mean, Mershon cannot be said to have acted fraudulently in inserting or permitting his solicitor to insert this claim, so that he forfeited the right to disclaim.

[9] We are confronted, then, by the rule that the patent was invalid, unless this claim is seasonably disclaimed in the Patent Office. It would seem that complainant ought not to have any decree whatever on a patent which is prima facie invalid; but if this apparently logical rule was enforced and if complainant was required to disclaim a certain claim as a condition of having a favorable decree upon other claims, he would be obliged to accept the judgment of the trial court upon the claim found invalid, as final, and must file his disclaimer and lose his right of appeal upon that subject, or else, he must refuse to file the disclaimer, whereupon the entire bill must be dismissed; and while complainant could appeal from that decree, yet if the appellate court found that the action of the court below in requiring the disclaimer was right, the decree would be affirmed without considering the claims found valid below, and so complainant would lose the benefit of the valid claims. For these considerations, it seems to me clear that in such a case the usual interlocutory decree for injunction and accounting should be entered upon the valid claims and dismissing the bill as to the invalid claims, upon the theory that the failure to disclaim cannot be unreasonable until complainant has had an opportunity to litigate the validity of that claim to the court of last resort. This rule has been definitely adopted and announced by the Court of Appeals in the Second Circuit (Page v. Dow, 168 Fed. 703, 94 C. C. A. 209), and so far as I am aware, has been customarily followed in this circuit (Plecker v. Poorman, 147 Fed. 528, Thompson, J.).

The difficulty cannot be met, in an interlocutory decree of this character, by providing that the complainant must, in the alternative, within the time limited, file disclaimer or take his appeal from that part of the decree dismissing the bill as to the invalid claim, because the complainant cannot appeal from that portion of such a decree. In re National Enameling & Stamping Co., 201 U. S. 156, 26 Sup. Ct. 404, 50 L. Ed. 707.

This conclusion does not cover the present case, because complainant has waived profits and damages and any accounting therefor, and asks the entry of a final decree. The Court of Appeals of this circuit, in Morgan Engineering Co. v. Alliance Co., 176 Fed. 101, 100 C. C. A. 30, directed that a final decree, in the Circuit Court, in favor of complainant, upon the valid claims, should not be entered unless a disclaimer was filed; but when we undertake to apply this general rule to a case in the present situation of this case, we meet the same difficulty above noted with reference to an interlocutory decree. Complainant could not, in this case, comply with such requirement without losing the right to take the opinion of the Court of Appeals on claim 1 and it does not seem unreasonable for him to delay his disclaimer until he has had that opportunity. In the Morgan Engineering Company Case, the Court of Appeals had considered and decided the merits of the invalid claim, and so there was no injustice in considering the patentee's reasonable opportunity as having expired and compelling a disclaimer. An inspection of the printed briefs in the Morgan Engineering Company Case shows that the considerations stated in Page v. Dow were not thought important, and

189 F.—48

that case and those considerations were not brought to the attention of the Court of Appeals deciding the Morgan Engineering Company Case. I do not think this last case was intended to lay down a rule applicable to the circumstances of this case.

The difficulty here cannot be met by requiring, in the alternative, a disclaimer or an appeal by complainant within a limited time, because any provision along that line, fully worked out, would tend to affect the finality of the decree, and might destroy complainant's right of appeal.

I see no way of preserving all rights except to proceed upon the assumption that the complainant is reasonably entitled to appeal, and that he will appeal, and that the eventual mandate of the Court of Appeals will properly dispose of the disclaimer question, leaving it with no present effect upon the decree of this court, except as to costs. If this assumption proves to be erroneous, and if the complainant rests content without an appeal or does not prosecute the appeal, the further action of this court upon that situation can be invoked by petition for rehearing, or review, or some proceeding of that general character.

[10] Complainant also objects to reciting in the decree the finding that this claim 1 is invalid. Such recitals may not be customary, but it is customary to make a finding and distinct adjudication that certain claims are good and valid as a basis for injunction, and I do not see why a corresponding recital and finding should not be made when the opposite result is reached