## HUTTEN et al. v. FRANK KREMENTZ CO.

(Circuit Court of Appeals, Third Circuit. April 4, 1916. Rehearing Denied May 25, 1916.)

No. 2070.

1. PATENTS ⚖➔328—INVENTION—FOLDING EYEGLASSES.

The Hutten & McDougall patent, No. 1,016,153, for folding eyeglasses, which, although having projecting or offset nose clips, are so constructed that by means of a spring pivotally connected at its ends with the lens frames such clips will pass each other when the glasses are folded, *held* void for lack of invention, in view of the prior art, in which all the elements are found.

2. WORDS AND PHRASES—"BRIDGE SPRING"—"PIVOTAL BRIDGE SPRING."

As applied to eyeglass frames, a "bridge spring" is a flexible strip of resilient metal used to connect the lens frames and hold them in position on the nose. A "pivotal bridge spring" is such a metal strip with its terminals connected with the lens frames by engagement with pivots seated in the upper part of the frames. It is capable of three movements, two from the pivot and one from the pliant or yielding quality of the metal strip, and is known in the art as a French double spring.

Appeal from the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Suit in equity by Edwin P. Hutten and Karl A. Zimmerman, known as E. P. Hutten & Co., against the Frank Krementz Company. Decree for defendant, and complainants appeal. Affirmed.

The following is the opinion of Haight, District Judge, on final hearing:

Patent No. 1,016,153, upon which this suit is based, was issued to Edwin P. Hutten and John McDougall January 30, 1912, on an application filed May 18, 1911, and was subsequently assigned to the plaintiffs. It relates to a form of folding eyeglasses, the distinctive feature of which is an "offset" or "angular" nose guard or clip. Infringement is not denied, but the validity of the patent is challenged. In support of this defense it is urged by the defendant that the eyeglasses of the patent were "on sale" for more than two years prior to the application for the patent. The patentees were employés of Geoffroy & Co., who were manufacturing jewelers in New York City. There is no doubt that some of these glasses were sold by Geoffroy & Co. as early as May 22, 1909. This, however, was not two years prior to the application for the patent. But the defendant contends that at least one pair were sold on May 14, 1909. The only evidence to support this contention is a memorandum made on a bill head or order blank of Geoffroy & Co. and dated May 14, 1909. It contains this statement, viz.: "Deliver the article specified, for inspection of Mr. Paul A. Meyrowitz and with the express understanding that the value thereof, or the goods are to be returned upon demand." Then follows a specification of the article, as follows: "One gold Oxford offset guards—*left to show.*" This, as well as the date and name "Paul A. Meyrowitz," is admittedly in the handwriting of the patentee, Hutten. The other parts of the memorandum, except as hereinafter noted, are printed. Hutten professes to have no recollection of this transaction other than that he identifies his handwriting. No other witness was called to explain it.

It is quite true, as the plaintiff contends, that the memorandum does not show that the glasses there referred to were of the folding type; but, without attempting to review the evidence, I think it is clearly demonstrated that they were of such type and were those covered by the patent. The only evidence, however, to show that they were sold either absolutely or condition-

ally is that supplied by the memorandum. Geoffroy & Co. had been manufacturing and selling what was known as a "straight guard folding Oxford" eyeglass, for about two years previously. Meyrowitz, among other customers, had suggested to Hutten, the salesman of the company, that there would be a more extensive demand for and sale of these folding Oxfords if they could be supplied with "offset" guards or nose clips, instead of the "straight" guards. Hutten and McDougall had thereupon, and shortly before the date of the memorandum, set to work to make this change, and devised the glasses of the patent. A sample was completed a few days before the 14th of May, 1909. Shortly after this date a number of these glasses were sold and delivered to Meyrowitz and others. These facts, taken in connection with the additional fact that no price was named in the memorandum, and that the glasses were subsequently returned to Geoffroy & Co., and the words "left to show" on the memorandum, lead me to the conclusion that these glasses were merely left with Meyrowitz as a sample, so that he might examine them, and, if found satisfactory, Geoffroy & Co. might secure orders from him for that kind of glasses. Thus they were not sold to Meyrowitz, nor left with him to sell for Geoffroy & Co., nor were they offered to him for sale; no title ever passed, either absolutely or conditionally; and there is nothing to show that they were left with Meyrowitz to buy if he approved of them. He did not subsequently buy them but returned them. Under these circumstances this pair of glasses were not, within the meaning of the statute, "on sale." Mershon & Company v. Bay City Box & Lumber Company (C. C.) 189 Fed. 741; National Cash Register Company v. American Cash Register Company, 178 Fed. 80, 101 C. C. A. 569; Covert v. Covert (C. C.) 106 Fed. 183; Craig v. Michigan Lubricator Company, 72 Fed. 173; Campbell v. New York (C. C.) 36 Fed. 260. The defendant having failed to show that the patented eyeglasses were "on sale" earlier than two years before the patent was applied for, the defense based on this ground fails.

But it is further contended by the defendant that, in view of the prior art, the plaintiff's patent does not involve invention. Broadly stated, the invention is claimed to consist in applying to a folding eyeglass "offset" or "angular" nose guards or clips and so arranged as to permit of folding one lens over the other without hindrance by the projecting clips, and without unduly straining the spring connecting the lens frames with each other. The patent contains four claims, none of which define the shape of the lenses, although in the drawings they are shown as circular. The "offset" guard, in one form or another, is an element of each claim. The first three claims do not contain as an element, or mention the means by which the lenses are to be held in folded position, but the fourth claim does, viz., "a handle on each of the lens frames and having a guideway for receiving the other lens frame, and a spring catch on the said handle for engagement with the entering lens frame to lock the lens frames in folded position." Each of the claims called for "posts" on the lens frames, on which the nose guards are fastened. In the first claim the guards are designated as "on said posts" and in the others as "integral on said posts." In claim 2 the "terminals of the nose clips" are stated as "being free of the lens frames and projecting inwardly." In claim 3 this feature is stated thus: "The inner edges of the nose clips being inclined and the lower terminals of the clips being adjacent to the lens frames." It is not disputed that as early as the spring of 1907, Geoffroy & Co. were manufacturing and selling an eyeglass embodying all of the elements of all of the claims of the patent, with the exception of those relating to the "offset" guards. They were fitted with what is known as a "straight" nose guard; that is, one located in the same plane as the lens. But even in these the edges of the guards protruded slightly beyond the sides of the lens frames. Long before the patent in suit was applied for, many forms of eyeglasses having "offset" nose guards and which could be folded were on the market, and were shown in patents both domestic and foreign. In none of these, however, was there the guideway of claim 4, but the familiar hook and post was used to retain them in folded position. In all but two the spring connecting the lenses was not pivotally connected with the lens frame, as called for in each of the claims of the patent in suit. This latter feature ap-

pears in the Dorn patent of 1868 and in the eyeglasses illustrated in the French catalogue of the "Société des Lunetiers," published in 1887.

It had for years been the custom of opticians to change the type, shape, and position of nose guards on glasses to suit purchasers, and very frequently "offset" nose guards were attached to the folding eyeglasses of the prior art. The latter, however, do not appear, so far as the evidence shows, to have been attached to the Geoffroy folding Oxfords of the 1907 type; but at least one optician did, on several occasions, bend the "straight" guards of these glasses into "offset" position, so as to fit the nose of customers, without interfering with the folding and automatic opening of the glasses. The type or shape of the "offset" guards shown in the patent were also old in the art. Glasses made in accordance with those shown as Figure 55 on page 54 of the English edition of the French catalogue were sold and used in this country between 1887 and 1909 quite extensively. On some of these the nose guards were "offset." They were designed to fold and were held in folded position by the usual hook and pin. The "offset" guards on these did not have posts separate and distinct from the guards, but a loop was made in the upper part of the guards, the end of which was fastened to the upper part of the lens frame, and the lower end was, without any loop, fastened to the lower part of the lens frame, in the same manner as on one style of glasses manufactured by the plaintiffs under their patent. The inner edges of the nose guards were inclined. It thus appears that "offset" guards on folding eyeglasses with pivotally connected springs were not new when the patent in suit was applied for. The loop of the French glass might readily be said to be the post of the patent; but, assuming that it is not, the question at once arises whether it constituted invention to substitute posts for the means by which the guards of the French glasses were fastened to the lens frames, or to use a guard, the terminals of which were free of the lens frame, instead of one whose terminals were fastened to the lens frame. I cannot conclude that it did. I think that it falls within the well-settled rule that it was at the best merely the substitution of an equivalent. It therefore follows that there is no invention in the combinations of claims 1, 2 and 3.

The remaining question is whether the combining of these elements with the guideway of claim 4 involves invention. As before stated, all of the elements of claim 4 with the exception of the "offset" nose guards were present in the eyeglass made and sold by Geoffroy & Co. as early as the spring of 1907. As "offset" guards on folding eyeglasses with pivotally connected springs were old, it required, in order to apply the "offset" guards to the Geoffroy glass of 1907, merely an adjustment of the location and shape of the guards. The evidence, I think, demonstrates quite conclusively (without referring to the opinions expressed by witnesses as to whether they could have done it if they had been called upon) that this was within the skill of any ordinary optician. No new idea was involved. In fact, the suggestion that such a change in the 1907 glasses would be advisable was not original with the patentees. I appreciate that courts have in many cases decided that slight variations from the prior art constituted invention, but I think the improvements of this patent fall within that class of cases discussed in Mr. Justice Bradley's classic opinion in Atlantic Works v. Brady, 107 U. S., 192 at 199, 2 Sup. Ct. 225, 27 L. Ed. 438, et seq. It follows, therefore, that all of the claims of the patent are void for want of invention, and that the bill must accordingly be dismissed.

One other matter requires mention. The plaintiff has moved to strike out the evidence given by witnesses who were examined in Southbridge, Mass., and Chicago, Ill. This motion seems to be based upon the ground that it was assumed by counsel before these witnesses were examined that they would testify regarding the prior use, knowledge and sale of the patented eyeglasses by two optical companies, located respectively at Southbridge and Chicago. Their testimony actually related to the prior state of the art and the practice of opticians in changing and adjusting nose guards. The testimony in Chicago was taken pursuant to section 863 of the Revised Statutes (Comp. St. 1913, § 1472), and the testimony in Southbridge pursuant to an order of this court which did not limit the character of the testimony.

I know of no principle that would make the testimony, if otherwise relevant and material, incompetent because counsel misapprehended the purpose for which the witnesses were to be sworn. As above shown, the decisive question in the case was whether the patent involved invention. This necessitated the ascertainment of the prior state of the art and evidence tending to show it was of course admissible. The defense of want of invention, including the right to introduce evidence of the prior art is always open and it is not necessary to set it up in the answer. Dunbar v. Myers, 94 U. S. 187, 198, 24 L. Ed. 34; Slawson v. Railway Company, 107 U. S. 649, 2 Sup. Ct. 663, 27 L. Ed. 576; Eachus v. Broomall, 115 U. S. 429, 6 Sup. Ct. 229, 29 L. Ed. 419; Baldwin v. Kresl, 76 Fed. 823, 22 C. C. A. 593 (C. C. A. 7th Cir.).

Munn & Munn, of New York City (T. Hart Anderson, of New York City, of counsel), for appellants.

Harry L. Duncan, of New York City, for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. This is an appeal from a decree holding invalid the claims of Letters Patent No. 1,016,153, for folding eyeglasses, issued to Edwin P. Hutten and John McDougall, January 30, 1912, and subsequently assigned to the plaintiffs. The bill charges infringement. Infringement is not denied. The sole issue is the validity of the patent, which is challenged upon the grounds, first, that eyeglasses containing the alleged invention were sold more than two years before the date of the application for the patent; and second, that patentable invention is not involved.

The defense of prior sale is discussed in the opinion of the District Court, above set out. It is clear that the defendant not only failed to sustain the burden of proving the alleged prior sale beyond a reasonable doubt, Coffin v. Ogden, 85 U. S. (18 Wall.) 120, 21 L. Ed. 821; Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017; but failed to show it even by a preponderance of evidence. Mershon & Co. v. Bay City Box and Lumber Co. (C. C.) 189 Fed. 741, 748. This defense must fall.

The patent is for folding eyeglasses, illustrated by the kind known to the trade as Oxford folding eyeglasses. Eyeglasses of this general type contain straight or flat nose guards attached to the inner curves of the lens frames, seated within the plane of the lenses, and are easily folded. The invention of the patent consists in the use of projecting nose guards or nose guards offset beyond the plane of the lenses, so shaped and placed as to permit the lenses to be as readily folded as in Oxford glasses with non-projecting guards. The patentees say:

"The object of the invention is to provide new and improved folding eyeglasses provided with angular nose clips and arranged to permit folding of one lens over the other without hindrance by the projecting clips and without unduly straining the spring, pivotally connecting the lens frames with each other.

"For the purpose mentioned, use is made of the lens frames pivotally connected with each other by a spring, and provided with rigid posts carrying angular nose clips adapted to pass each other on swinging one frame toward the other, and to allow of turning the frames on their pivots to pass one frame over the other."

The specifications fairly state the subject matter of the claims, the features of which, when assembled, are,

(1) A pair of eyeglasses, comprising lenses;

(2) Frames for holding the lenses;   ·

(3) A spring *pivotally* connected at its ends with the said frames at the top thereof;

(4) Posts on the said lens frames and projecting towards each other;

(5) Nose clips on said posts and projecting in the same direction and being outside of the plane of the frames;

(6) The spring being of such length and it and the clips being so arranged relatively one to the other that the clips pass one another by swinging one lens frame toward the other to fold the said frames one upon the other;

(7) A handle on one of the lens frames, having a guideway for receiving the other lens frame, and a spring catch for engagement with the entering lens frame to lock the lens frames in folded position.

Every element of this construction is old, and the function of each element, as employed in the combination, is not varied or distinguished from the function which each would separately exert, if employed alone. Lenses and lens frames are as old as eyeglasses themselves. The pivotal bridge spring has been in use for fifty years (Letters Patent No. 76,420 to Dorn, 1868). Posts to connect the frames with nose guards have been in use since 1884 (Letters Patent No. 292,479 to Fox). Projecting nose clips or nose guards are as old as Letters Patent No. 343,876 to Wells, 1886; Letters Patent No. 346,713 to Boker, 1886; and Letters Patent No. 549,991 to Bilhoefer, 1895. A handle on a lens containing a spring catch used to hold the folded lenses is a standard lorgnette spring catch, certainly as old in the art as the Geoffroy Oxford eyeglasses of 1907. Folding eyeglasses, appear in Letters Patent No. 76,420 to Dorn as long ago as 1868. Therefore, if invention is to be found in the eyeglasses of the patent in suit, it must reside in the remaining element of the claims, which consists of the arrangement of these old elements in a manner to permit projecting nose guards to pass each other without interference when the lenses are folded one upon the other.

If the patent related merely to folding eyeglasses with projecting nose guards, it would be anticipated by folding eyeglasses with offset nose guards made by the American Optical Company in 1898. These eyeglasses contained a bridge spring *rigidly* connected with posts projecting from the lens frames. The claims of the patent, however, are not broad enough to cover glasses with any kind of bridge spring. They restrict the patent to eyeglasses comprising "a spring *pivotally* connected at its ends with the said frames." This limitation appears in each claim. While the patentees disclaim "the special construction of the pivotal connection" as a part of the patent, and while they do not limit themselves "to the particular construction shown and described," nevertheless as each claim provides a construction with a bridge spring "pivotally connected" with the frames, and discloses no other construction, we are constrained to limit the claims, for the pur-

pose of our consideration, to a structure including a bridge spring pivotally connected with the frames.

A bridge spring is a flexible strip of resilient metal used to connect the lens frames and hold them in position on the nose. A pivotal bridge spring is such a metal strip with its terminals connected with the lens frames by engagement with pivots seated in the upper part of the frames. These pivots are, in turn, actuated by spiral springs. A pivotal bridge spring is capable of three movements, two from the pivots and one from the pliant or yielding quality of the metal strip.

A pivotal bridge spring is known in the art as a French double spring. It appeared as early as Letters Patent No. 76,420 to Dorn in 1868, and is described in the Catalogue of Société des Lunetiers of 1887. While there is dispute as to whether the eyeglasses of the Dorn patent of 1868 and of the French publication of 1887 contained offset nose guards, there is no dispute that they were folding glasses and that they contained a bridge spring pivotally connected with the lens frames. Resolving the controversy on this point in favor of the patentees, we are inclined to comply with their request, that we accept the Geoffroy straight nose guard folding Oxford of 1907 as the state of the art prior to the patent, and consider the single question whether invention is involved in substituting upon such a structure offset nose guards for straight nose guards in such a manner as to enable the lenses to fold freely.

The patentees claim that they were the first to find a way for one offset nose guard to pass the other when lenses are being folded, and that the way found and the means disclosed by them constitute invention. We are not at all satisfied that they were the first to point out such a way, but, assuming for the purpose of this discussion that in this they are correct, we must inquire what was the way they disclosed and whether it amounted to invention.

The prior art shows that when the lens frames of glasses are connected by a bridge spring, the terminals of which are *rigidly* connected with the frames, the lenses will not close smoothly and in some constructions will not close at all, when the glasses are equipped with offset nose guards. But bridge springs of this fixed character were not used upon Oxford glasses, nor were bridge springs with fixed terminals used upon folding glasses of other types, excepting at a very early period. The art discloses that at a period beginning about 1870, pivotal bridge springs were used both in this country and abroad upon glasses that were intended to fold, and the reason for the use of such springs upon folding glasses is perfectly obvious to anyone manipulating the lenses of such glasses.

A bridge spring pivotally connected, being capable of three separate and successive movements, causes the moving lens to move or swing in three directions during the folding operation. When glasses are firmly held by the handle on the right lens frame, with the plane of the lenses vertical, a depression of the left or moving lens causes it to move in a downward and vertical direction, the right pivot of the bridge spring being used as an axis. With this movement of the left lens, the left nose guard, whether it be straight or projecting, is car-

ried directly below the right nose guard. Further pressure upon the left lens produces an axial movement of the left pivot, effecting a change in the direction of the movement of the left lens from vertical to horizontal, and toward the right lens, and causing the left nose guard to be carried beyond and to the right of the right nose guard. Continued pressure upon the left lens brings into action for the first time the resilience of the metal spring, causing the left lens to move over the right one until its motion is arrested by engagement with a sprig or catch and the folding movement is completed.

It thus appears that it is the *pivotally* connected bridge spring with its three clearance motions, that makes possible the free passage of nose guards in the movement of folding. Such a spring is old, very old. The patentees neither invented it nor discovered its function in folding eyeglasses. What the patentees did, and all that they did, was to so locate the offset nose guards upon the lens frames and to so shape them that, in the normal movements of lens frames connected by a pivotal bridge spring, one nose guard would clear the other, and upon completion of the movements, the two would nest. The idea of doing this did not originate with the patentees. It was suggested by the demand of the trade for offset instead of straight nose guards on Oxford glasses. That demand the patentees immediately met. To make such a substitution permitting such a result required nothing more than a little patience and some skill. It meant that the mechanic should select from the great variety of nose guards of the art, two of an appropriate design, alter their shape, if necessary, and by experiment find for them a proper location on the lens frames, so that upon being folded, the projecting guards would pass one another. The tripartite movement of the pivotally connected bridge spring made the accomplishment of this task obvious, the mechanical performance of which did not call for the exercise of invention and involved nothing more than mechanical skill. If the conception of the patentees amounted to an advance in the art, it was such as would spontaneously occur to a skilled mechanic or operator in the ordinary progress of manufacture, and does not merit the reward of a patent monopoly, which under the policy of the law is awarded exclusively to those who make some substantial discovery or invention which adds to human knowledge and makes a step in advance in the useful arts. Atlantic Works v. Brady, 107 U. S. 192, 199, 2 Sup. Ct. 225, 27 L. Ed. 438. We find no error in the decree of the District Court in adjudging invalid, for want of invention, all of the claims of the patent in suit.

The decree below is affirmed.